Second case this morning, Case No. 4141036, Tuggle v. Country Preferred Insurance Company, for the appellant we have Mr. Lichtenberger and for the appellant we have Mr. Carlson. Mr. Lichtenberger, if you would proceed. Mr. Lichtenberger, Mr. Carlson for the appellant. All right. Well, the information from me is wrong but I should have recognized it so I'm not going to pass on the blame. Thank you for correcting the record. I represent Country Preferred Insurance Company. Here we have a common situation of an automobile accident with a torque feeser which had limits less than the underinsured motorist coverage of Mr. Watson. By coincidence, it was the same company that insured both parties. Milo and Noah, the torque feeser had liability limits of $100,000. The liability limits of $100,000 were paid without any litigation promptly and during that time period there was also medical bills that were being incurred by Mr. Watson and some were being submitted. They were paid up to the limit of the med pay of $50,000 under the uninsured motorist policies. As we set forth in the case that was pretty well established that the purpose of underinsured motorist coverage is to put the insurer of the same person as if the torque feeser had insurance in that identical limit, in this case $250,000. Now of course in this case Mr. Watson recovered $250,000, $100,000 from the torque feeser. Of course the very nature of uninsured motorist coverage presumes that someone has insurance so when the accident occurred at that moment the torque feeser was $100,000 there was a maximum of $150,000 of uninsured motorist coverage. Of course if the torque feeser had $250,000 there wouldn't have been an uninsured motorist claim in the first place. But here we have two coverages under the country policy which are very common. Of course the med pay and underinsured motorist and there is a set off in the policy language for either. For example here if the underinsured motorist coverage had been paid first up to the limit of $150,000 there would have been no medical payments coverage whatsoever paid. But the same $250,000 would have been received by Mr. Watson. Which his attorney took a third of the $100,000 from the torque feeser, a third of the medical payments and a third of the... Wait a minute. You said the attorney took a third of the medical payments? That's my belief. A counsel can address that further but that's what he admitted. So your position is that the attorneys took a third of the $50,000 of medicals paid? That's what I believe he admitted. And now they want a third from the insurance company. And presumably a third from... If you notice from the record there was a delay in payment of the actual check of the... I don't know all the details of the medical providers but he wanted to resolve the liens with the medical providers before finalizing the settlement for the underinsured motorist coverage. Which I don't know if there would be an argument. That's where I would see a common fund to be arguing that you were a third to the medical provider if they got back any money out of the proceeds from either the torque feeser or the underinsured motorist coverage that you would get. His lawyer would probably charge a third as well to that medical lien provider. Well back to my question. You said that's what I think. Well that's... Again I'm not certain about the medical provider thing. I believe Mr. and if I'm wrong he can correct the record. But that's what I thought he admitted on the record in the lower court that he got a third of the medical payments as well as the torque feeders payment and the... I think you said just the opposite of that but we'll wait and hear from him. But as I understand then from what you're saying if his representation is that he or his firm did not get a third from the medical payments made by the insurance company then you accept that? As an officer of the court I would accept that, your honor. Yes, I would accept whatever he said on that. As I understand your claim basically is that the insurance company has a right to set off, correct? Right. It's a contract that has automatically dollar for dollar as you're paid. The medical payments... Well let me ask you, if you're correct in that and it appears to be that's what the language of the contract is, but for the involvement of the attorneys what would have you set the $50,000 off against? But for the involvement of the attorney? Right. I mean what do you set off against if the attorneys haven't established a fund by their settlement for the $100,000 in under insurance? But then we didn't collect anything from under $100,000. He didn't offer us any money. We didn't collect any of that $100,000 back. $100,000 was paid and went fully to Mr. Watson and his attorney. We got zero of that fund. So the underinsured motorist claim was made later. No, you got zero of the $100,000 but you got your $50,000. They just want their one-third for collecting it for you. We didn't get $50,000. We paid $50,000. Our contract was to pay up to $250,000 if there was no underinsured motorist coverage up to that amount. We paid $150,000. We paid the balance of the contract. We got no money back at all. We paid $50,000. We paid $50,000 of it as med pay. But med pay, as the court knows, is just a first-party coverage that applies regardless of fault. You could be at fault in your own accident. Okay. Walk me through it. What exactly did the insurance company pay? Okay. Well, Country Preferred, Mr. Watson's carrier, paid $50,000 of med pay and $100,000 of underinsured motorist coverage. Mr. Watson, prior to that, received $100,000 from Country Mutual under the liability limits of the policy Mr. Ngo, or Mylon Ngo, had in effect at the time of the accident. So, for example, if the argument here, if the $100,000 is considered the credit, if Mr. Ngo, under that analysis, if Mr. Ngo had had $250,000 liability limits, that means that you're saying, we would have paid zero, and you would say, we're getting a credit for $250,000, so we should pay a third of $250,000 to the attorney who saved us $250,000 because the liability limits were $250,000. That's just not what uninsured motorist coverage is. That's why this whole area is, that's why some of the courts and judges have recognized there is no fund that we're, there is, I still can't find any fund that we're getting any benefit from or money back since we got zero. Okay. My question is, what exactly did Preferred pay? I know you paid the $50,000 in medicals, correct? Correct. And they paid $100,000 additional. That's $150,000. $150,000. That's the total they paid. Country Preferred, because he'd already gotten $100,000 from the policy, the liability policy. And now under the ruling of the Trout Court, you'd pay another $16,000, whatever. Right. Well, that's less than $250,000. Well, right, but uninsured motorist coverage presumes there, it's not an uninsured claim, if it was uninsured, if Mr. Noe had no insurance, there would have been a possible exposure of $250,000. But underinsured motorist obviously presumes there is some insurance, and here there was $100,000, so you're only paying the gap. That's what the Supreme Court has talked about multiple times. It's the gap. Because if Mr. Noe had $250,000, there wouldn't have been any underinsured motorist coverage paid or any uninsured motorist coverage paid. Because there's no gap. It doesn't apply every time, to every accident. It only applies in situations where you have purchased limits higher than what the torque speedster has, and you have damages in that amount, higher than those limits. It doesn't, it's not on top of it, it's not a stacking on top of the liability coverage, it's the gap. And where you put the person, because if there was no, to put them in the same position as if Mr. Noe had liability coverage. So if he had liability coverage of $250,000, there wouldn't have been uninsured motorist, but he could have collected $250,000 from Mr. Noe if he had damages up to that amount. So he's in the same position, and now they're trying, and of course the whole idea of this benefit for us, here we have, we had no attorney working for our benefit. We never asked him to do any work for us, he never did any work for us, he never collected any money for us. In fact, his demand was we pay $150,000 on top of the $50,000 of medical payments, or pay $200,000, or that his client receive $300,000 total more. So he's never acted in our interest or done anything to benefit whatsoever. And second, you know. Okay, well what position would the insurance company have been in but for the $100,000 settlement? Where would the insurance company be? They'd be exposed to $150,000 total. Excuse me? They'd be exposed to $150,000 total. Right. Because once they paid the $50,000 of med pay, they have an obligation. That's not my question. Suppose there is no settlement for the $100,000. The FERS already paid out $50,000. They didn't settle with it. They didn't even do anything. So you want your $50,000 back. What would you do? If we want our $50,000 back, there's no one to collect it from. You can't go against the tortfeasor? We could have gone against. Oh, if they didn't pursue a claim against the tortfeasor? Right, that's what I'm saying. If we would have a right. If we just paid $50,000 of med pay, we have a right to pursue the tortfeasor under the contract. And that would cost you money to do so. If that had happened. It may be not a third or 40%. I don't know what the agreement was. But the point is, back to my original question, what would you offset the $50,000 against but for the attorney's work in this case? On behalf of the user? We didn't offset it against the $100,000. We offset it against the uninsured motorist coverage. No, you offset it against the $150,000, right? Against the $150,000 of uninsured motorist coverage, right. We paid $50,000 of it as med pay and $100,000 labeled uninsured. It could have been $150,000 as underinsured or no med pay. So we might not have paid any med pay, just $150,000 of uninsured motorist coverage. And then we wouldn't be. We can also seek. We could have sought. Judge, we can also seek our entire underinsured motorist coverage from the tortfeasor. You know, for example, paying the person with assets just because he only has insurance. Obviously, in most cases, that doesn't happen because the person doesn't have assets other than their insurance. The tortfeasor is obviously liable for the entire amount, technically under the law, or potentially liable for the entire amount we pay, no matter whether he has insurance or not. But that, practically, you don't pursue that because, you know, unless you hit a, or your tortfeasor is a millionaire or something. But here, we, so if we had paid $150,000, there's just no money. Here, the lawyer is getting the third. Also, the law makes pretty clear that this common fund document is sort of based on quantum merit, you know, quasi-contractual, equitable, what have they done to earn the money, or so forth. And here, we, we had a contract that would expose the country to a maximum of $150,000, no matter whether it was MedPay or underinsured motorists, where the tortfeasor had $100,000, and we paid $150,000, and we got zero of that $150,000 back. We're out to $150,000, but now, under the crowd source ruling, we're paying another $16,000, so now we're paying $166,000. Yeah, but the only reason your, the only reason your exposure went from $250,000 to $150,000 is because of the actions of the attorney for the injured party. No, it didn't, because the liability, because they had $100,000 liability insurance. Underinsured, whether you collect it or not, you get a full credit for the $100,000. That's what I'm saying. They settled for $90,000, but that happened the day of the accident. The day he had an accident with the, before the lawyers were involved, the fact that the tortfeasor had a policy with $100,000, that means the maximum underinsured motorist exposure is $250,000. Whether he collects that whole $100,000, you still get a credit for the $100,000. It's a credit that happened the day of the accident with the tortfeasor with that limit, before the attorneys even hired that already existed. He didn't have to do anything, he didn't do anything to benefit us, because that's just a fact of the accident of having an insurance policy with $100,000. There automatically could not be exposure greater than $150,000, because the tortfeasor had a policy. If the tortfeasor had a policy of $50,000, there couldn't be exposure greater than $200,000. If he had a policy with $250,000, there could never be an underinsured motorist claim in the first place. And then you're saying then, again, your analysis would be, he saved us $250,000 because he collected the $250,000, but that didn't exist. The law says there's no underinsured motorist. You compare the limits, and there's no underinsured motorist in the first place. And by that analysis, we know a third of $250,000, because he saved us $250,000 because the tortfeasor had a $250,000 that he worked to collect on. We would have no underinsured motorist exposure, but a fee of one-third. See, that's why, if you play it out like that same analogy, that's what you have to get to, which is not the law. Which can't be the law. He would get a third of the $250,000 from the tortfeasor, and then another third of the $250,000 saved from, so he'd get two-thirds of $250,000 if you paid twice. If you really look at it, there is no, I mean, in the case, the Stevens case, I mean, there is really no common fund as the dissent recognized in Stevens, and this is a different fact pattern, but, and of course here, they didn't do any effort. We didn't request that he do anything. We didn't assert a subrogation claim in this case. So that's why we're just asking the court if, you know, I think if you look closely at the facts and think through the consequences, and what the purpose of underinsured motorist coverage here, where the person has been fully compensated up to the limits of the contract that they purchased, there is no common fund that, there's no money the country got back, and there's no common fund to assess a fee against under the facts of this case. Any other questions? I don't see any, but if you're finished, you'll have rebuttal. Okay. Okay? Thank you. Appreciate it. Counsel? I guess one issue I want to clear up for the record is I did not charge the client any fee on the medical payments coverage. That fee, if collectible at all, would have to come from Country Mutual, in my opinion, so this whole notion that I've somehow double-collected or over-collected is false. It just didn't happen. I made that clear, I thought, on the record. I talked to counsel afterwards, and yet we're still having those same allegations made. The issue here is the creation of the tort-feasors coverage, or the creation of that fund then triggers the underinsured motorist coverage. If not for that, we never get to the fact or get to the point where there's money for them to take a credit against. And one of the hypotheticals presented or talked about was that we didn't have to collect anything from the tort-feasor in order for the underinsured motorist coverage to get the $100,000 credit. However, in reality, if the case was not valuable enough to collect the entire tort-feasor coverage, there could be no possibility that the underinsured motorist coverage would have paid out more coverage on top of that. They would have had to assess or assert a lien against the tort-feasors carrier in order to get their $50,000 back. There was no way they could get that back. The reason why this case happened the way it did was because when I made my demand, I made my demand for the underinsured, I'm sorry, the tort-feasors carrier coverage of $100,000 and the underinsured motorist coverage all at the same time. These claims were being handled out of the same office. If you look at the letters that were part of the record, you'll see that one of the adjusters, Chris Giro, was handling the case for, let's see here, he was handling the case for, I believe it was the underinsured motorist coverage, and Nathan Franz was handling for country for the tort-feasors coverage. And if you look at the letterhead, these two are working in the same little claims office out of Champaign. So these two are able to talk about this case at any time that they want to. And I'm sure that at that time, they decided this case, we don't have to assert a lien against the tort-feasors coverage. We've got enough damage here. It's not only going to trigger some underinsured motorist coverage, it's going to trigger the entire $250,000. We can just sit back and make our credit claim against the underinsured motorist coverage. That's exactly what happened in the Stevens case. In the Stevens case, ultimately they filed a lien or subrogation interest against the tort-feasors carrier. But when they realized that there was an additional $50,000 that was going to have to be paid under the underinsured motorist coverage of that case, somehow they miraculously waived their lien and allowed Stevens' attorney to collect that entire $50,000. Then they turned around and tried to pick an offset, just like here, against the additional $50,000 available under Stevens' underinsured motorist coverage. So although there's a factual difference as to how the claim initiated, ultimately the actions of Country was exactly the same in both of these cases. And in the Stevens case, the court said, no, you still took money, or you still were able to collect money out of this fund created by the plaintiff's attorney. And I'll just say this to wrap it up. I don't want to go too much further, but I think one of the problems that we're running into here is that Country or the insurance company, they want to intermingle the terminology and the funds. It suits their purpose. They want to talk about the MedPay and the underinsured motorist claim like it was just one big coverage that was available to Mr. Watson under the policy. However, if you look at the record and you look at the documentation of the record, the policy itself clearly sets forth that underinsured motorist coverage is one type of coverage and medical payments coverage is a different type of coverage. These are two separate coverages under the policy. Section 2 of the policy addresses the uninsured motorist coverage and sets forth the terms and conditions. Section 3 of the policy sets forth the terms and conditions of medical payments coverage. And there can be no doubt that Mr. Watson paid premiums for each of those different coverages. So they can't now be combined into one. There were two different coverages. When I made the recovery from the tortfeasors, $100,000, it triggered the underinsured motorist coverage. That was $150,000. It was from that $150,000 they were able to take credit for the $50,000 in medical payments coverage. Thank you. Counsel, before you sit down, what is the common fund? Because to me it's rather confusing. The common fund is the entire $150,000 that would have been available from including the tortfeasors' $100,000 and the additional $150,000 available through the underinsured motorist coverage. Those two together make up the common fund. I will go further. If this case had not resulted in enough damage to trigger the underinsured motorist coverage, then the common fund would have just been the $100,000 from Mr. No's policy, and there's no doubt the country would have asserted its subrogation interest against that $100,000. They were not just going to eat that $50,000 that they had already paid out. In this case, they didn't have to do that because the damage was significant enough to trigger the underinsured motorist coverage. That extended the common fund out another $150,000. That's the common fund from which they took the credit. It seems like you're arguing that you created, as part of the common fund, the very insurance that your client paid for. I'm having a hard time grasping that. My client paid for underinsured motorist coverage, but it wasn't an automatic right to just go in and claim it. He still had to be able to prove up his case. I had to present the facts and evidence of the case and the damage of the case such that they would pay it. They could have come back and said, no, we don't think the damages are that high. We don't think the liability is clear. They have the right to refuse to pay that money. I'm trying to figure this out, too. What did you do on behalf of the injured party here? I gathered up his medical records. I met with him. I made a determination of what damages were created. I investigated to find out whether liability was an issue. I presented the facts and the evidence and the damage evidence to the tortfeasor's carrier and convinced them that the damages were high enough that they should tender the $100,000 limits. Who's the tortfeasor's carrier? Country. Part of my confusion here is we've got multiple countries. Preferred to be country mutual? There's actually three countries, aren't there, involved here? There are different country entities, but ultimately, and I think the parties agree, that it's all part of country insurance. It's all part of the same. Like I said, the adjusters who handled this claim, and you can see on the letterhead, they're working out of the same office. This is all part of one insurance group. Who was the injured party here? What was his name? Mr. Carol Watson. Carol Watson was injured by a milo-known automobile accident. Correct. What were the nature of the injuries he suffered? Oh, boy. Bad stuff? Yeah, he had a, it was either a double surgery of the shoulder or the knee. I don't recall which, but yeah, significant injuries. So he contacts you to represent him? Correct. And you gather up all this information and make a demand for coverage from his, the Torch Pieces Insurance Company, and his own coverage? Yes. I made a demand at one time for both coverages and provided both insurance adjusters with the medical records, medical bills, and my argument as to why they were responsible for policy limits in this case. I mean, ultimately, this case was probably worth more than $250,000. That's just all the insurance that was available. So, and you collected $250,000 on behalf of your client? I collected $100,000. That's a little bit of a, I'll tell you what I collected, and you can decide how I guess we would determine that. I collected $100,000 from Mr. Noh's country policy, the Torch Feeser, then the adjuster for the underinsured motorist coverage, which I believe was Mr. Dro of country. He agreed that they were on the hook for the additional $150,000. That's your client's policy? That's my client's policy. So your client had a policy that said, if some Torch Feeser hits me and his coverage isn't adequate, I've got, I'm paying for insurance coverage for the extra, up to $250,000? Right, up to an additional $150,000. So it's $250,000 policy offset by anything the Torch Feeser has. So your claim then on your client's policy was underinsured for $150,000 more? An additional $150,000, correct. Okay, and your client ultimately collected $250,000 minus, I guess, whatever was paid to medical bills? What about that? He collected a total, well, $50,000 of medical payments coverage was paid to providers during the course of his treatment. Not to him, but to the providers. By whom? By the insurance company? By the insurance company. Okay. The medical bills were higher than that. That's just when the limits of the medical payments coverage exhausted. So at that point, they didn't pay any more because they weren't contractually obligated to. Chris Jarreau, on behalf of Country, agreed that this was a policy limits case and agreed that the $150,000 was appropriate and then instructed me they were going to, but they weren't going to pay me $150,000. They were only going to pay him $100,000 because they took credit for the $50,000 they had already paid under the medical payments coverage. So technically, he collected $200,000 and his medical providers collected the other $50,000. So, your claim is you did all this work for your client who got the benefit of $250,000? He got the benefit of the $200,000 he collected and I suppose we could say he received some benefit in that he collected the $50,000. Well, if the insurance company hadn't paid that, he'd be on the hook for it, wouldn't he? That's right. He would have either had to pay that out of his pocket or I suppose submitted it to his personal insurance. So, under your contract with your client, you were paid a contingent fee of your work for the $200,000 he got? Correct. And your position is you should get a third of the $50,000 that they took? That's correct. Not from my client, but from the insurance company because I allowed them to get their $50,000 back by creating the fund by which they could take the credit. If not for the fund, they're out the $50,000. And they say, if I understand correctly, well, we always had to pay this anyway and I guess your position is they might have said, no, we're not going to pay you or what? No, I think that that's right, that they had to pay the $50,000. It's just that they had the right to go back and get that money and they certainly would have gotten the money. If I had not, as you had submitted, if I had not made any claim at all, then there's no doubt the country would have gone back to itself, to its own country agent and say, you owe us $50,000. Mr. No was the one that caused this accident. We paid his medical bills. Now we want our money back. What if there was some question about the liability here and whether or not Mr. Watson, who was your client, was the tortfeasor? He went through the red light or whatever it was as opposed to Mr. No. How would that have changed things? If that had happened, then again, they would have had to pay out the $50,000 under their medical payments coverage, but there wouldn't have been any, he would have been the tortfeasor. They couldn't have gone against himself to collect the money. It would have been his coverage. There would have been no liability coverage available to Mr. Watson under that scenario. If he had been the guy who went through the red light, what would his insurance coverage have been? $50,000 in medical payments coverage. That's pursuant to his insurance contract? Yeah. Then he would also have liability coverage because he might be the one getting sued. Right. Not collected by him, but that's right. Then Country might have been on the hook to pay Mr. No money, and then the roles would have been reversed. Then Mr. No would have been attempting to collect money from Mr. Watson's policy. I don't know what kind of other insurance Mr. No had other than his $100,000. It's your position that this is like the Stevens case? This is exactly like the Stevens case. The facts started off a little bit different in Stevens because in Stevens, the Country initially asserted a lien against the tortfeasor's carrier, and I think the reason why that happened there and not here is because in that case, State Farm was the tortfeasor carrier. They didn't have to do that in this case because Country had both coverages. They could have asserted a lien any time that they wanted to. In this case, had Mr. Watson as the victim been disputed, and let's say No says, I wasn't the guy who went through and why it was Watson, you'd go on to trial and it was litigated, and the jury comes back and says, No, No is the guy, Watson's the victim, and they accept your argument. How would this case have been any different under those circumstances? Would the human fund you claim would still be the same amount? I don't think it would have been any different. Had they come back and just said, let's say that we had gone to trial in those circumstances and the jury had come back at $250,000 or more, then I think everything would have been exactly the same, except that then Mr. Watson would have been entitled to go after Mr. No for anything over and above. Not only would Mr. Watson have been able to go after Mr. No for anything over and above, but also Mr. Watson's insurance company country. Well, Mr. No is judgment proof. Right. Let's just assume he's got nothing. As far as... If his judgment proof were in the same spot we're in today, that would have triggered the additional, up to additional $150,000. Had there been a full trial, this is a question I want to ask Mr. Carlson, had there been a full trial and the jury comes back with an excess of $250,000, but let's say it's $250,000 is really the money in play here, it seems to me that you'd be entitled to a third of everything that the jury rewarded your client and that the insurance company had to pay. I think that's right. I think... I can't speak for Mr. Carlson really, but I think his logic would say no though. His logic would say no because their $50,000 credit was already... That's the question I'm going to ask. It's the exact same thing as the Stevens case. That's what they did. They tried to take the $20,000 in med pay there. They tried to take credit against the... and there was an additional $50,000 not an additional $150,000 and Country, who was the insurance company in that case, made the exact same argument they're making now that there was no common fund and of course the court concluded yes there was. When the torque feesers coverage that is the common fund. Anything else? Thank you. Great. Bob? Country Financial is like the trade name. There's Country, in this case Country Preferred and Country Mutual where a person can qualify because there's a different premium, different underwriting standards. They just have a couple of different companies that might cover someone. If you have a better driver's license you get a Country Mutual policy versus a Country Preferred so that's the only reason. They are owned by the same umbrella company. They just might issue a different name depending on your underwriting. Let me ask you the same question I asked Mr. Lichtenberger, counsel, and the question is this. Let's assume there is a dispute as to liability and the case went to trial and Mr. Lichtenberger represented Mr. Watson. The jury agrees with their claim and returns a verdict of $400,000 for damages and what not but essentially we're talking about the insurance coverage the most would be $250,000 because no is judgment proof. And there's $250,000 that Mr. Watson could collect from the various insurance coverages let's assume. Would Mr. Lichtenberger under those circumstances be entitled to collect a third? So he's going to trial on underinsured motorist coverage and the torque features coverage? No, he's going to trial on everything. He's going to trial just on liability and the jury comes back $400,000 verdict and we find in favor of Mr. Watson against Mr. No. And I'm now the trial judge and Mr. Watson says or Mr. Lichtenberger on behalf of Mr. Watson says here's $250,000 worth of coverage that should be available $100,000 under his policy and the $250,000 minus the $100,000 for a total of $250,000 that the country should pay and that's what the insurance coverage is and looks to be like you're agreeing that's what it would be. So the question would be if the situation had been a trial wouldn't they be entitled to a third of the $250,000? Well if there's $250,000 of liability coverage total they arguably would be entitled but here that wouldn't happen under the underinsured motorist coverage under the country policy as the Gibson and Becker cases talk about. That was the exact issue there. They reduced the liability coverage by the $50,000 of MedPay. He is correct that UIM and MedPay are different coverages and that's what the court has said. MedPay is a different it can be reduced or accredited under a number of circumstances. It pays regardless of fault and it can not pay or not reduce or whatever so you wouldn't have gone to trial if you already got $50,000 of MedPay and you went to trial the maximum liability coverage under the Gibson and Becker cases is $200,000 because you already would have been reduced by $50,000 so the most he could have ever recovered would be a third of $200,000. The judgment would be for $250,000 but you are talking about a set off. But it wouldn't have existed that's under the Gibson and Becker. Isn't it a set off after you paid for the lawyers fees? No, but it's already happened. It's already happened prior to. What if it hadn't happened? If it hadn't happened? What if the insurance company said we'll pay you depending on liability and what we see or they just hadn't paid yet. I guess if they hadn't paid there would be a maximum of $150,000 available. They have to pay it but they haven't yet. They haven't paid it but they have to pay it yet. Then he would get an arbitration or a verdict up to his damages up to the limits of the insurance and then whatever contract he had with Mr. Watson for his fee would be between him and Mr. Watson. He could have a third. So as the trial judge I wouldn't be awarding him but you wouldn't be doing that because that's a contract between Mr. Watson and the lawyer and you wouldn't be involved in the fee because he could have 25%, 33% or he might not charge anything. Well, there's no dispute among them but he's saying I want to see the insurance company throw a $250,000 into the pot so I can get my third. Wouldn't the judge be involved then? He could be involved then. Oh, they're just negotiating? Well, no. There's no nexus of that and he says and his client agrees we have this third contingency fee and we want the insurance company to throw $250,000 in the pot. And there would be a set-off for the $50,000 if MedPay had already been paid just like in an arbitration. Typically, your claim would go to an arbitration and if they're awarded $50,000 the arbitrators don't typically apply the set-off. The set-offs apply automatically. There could be set-offs not just for the truck feeders but for other things depending on the contract as the Becker case said. So you wouldn't get more than the contract would allow. Here, his example of that if Country if he only got $100,000 from Mr. No and there was no underinsured motorist claim and Country asserted a lien for the $50,000 that he paid in MedPay that would be against the $100,000 that he got from No, right? If he only got $100,000 Country would get money back out of that $100,000 so he's saying I've entitled for a fee if Country got back $30,000 of that $100,000 then he's saying I get $10,000 of that $30,000 Country got back. But here, Country, No kept the entire $100,000. He didn't get any money of that $100,000. His example says we go after the $100,000 and get money back out of it but we didn't go after and that's why it's different in these circumstances. Counsel, I have one last question. I know you disagreed with the Stevens case. Are there any published cases that have questioned it overturned it or cited it with approval to your knowledge? I'm talking about published cases. Published, no. There aren't any that have either cited it or approved it or disapproved it to my knowledge and I have several cases involved in the same common fund issue so I'm dealing with other lawyers on the other side and they haven't cited me any cases in opposition that are published that comment on Stevens. And I accept counsel's representation about the MedPay and the charge of fee.  was just paid by the insurance company on the bills separate from the attorney. Thank you. The case is submitted. The court stands in recess.